IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

WALTER McGHEE, II,        )
                          )
    Plaintiff,         )
                          )
v.                     )    No. <u>05-2834 Ml/P</u>
                          )
MICHAEL J. ASTRUE,     )
COMMISSIONER             )
OF SOCIAL SECURITY,    )
                          )
    Defendant.         )

---

## REPORT AND RECOMMENDATION

---

Plaintiff Walter McGhee, II, appeals from a final decision of the Commissioner of Social Security[1] (the "Commissioner") finding that McGhee's disability ceased as of June of 2003 and terminating his disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 <u>et seq.</u>, as of August 31, 2003. The appeal was referred to the United States Magistrate Judge for a report and recommendation. Based on the entire record in this case, the court proposes the following findings of fact and conclusions of law, and recommends that McGhee's appeal be denied and that the Commissioner's decision be affirmed. The court further recommends that McGhee's Motion for Leave to File Amended

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, while this appeal was pending. Therefore, Astrue has been substituted for the former Commissioner, Jo Anne B. Barnhart, as the defendant in this case. <u>See</u> 42 U.S.C. § 405(g).

Pleading (D.E. 20) and Second Request for Leave to File Amended Pleading (D.E. 22) be denied.

## I.  PROPOSED FINDINGS OF FACT

McGhee filed his application for disability insurance benefits on August 13, 1998.  (R. at 41-43).  He alleged a disability onset date of May 6, 1998, citing a birth defect that resulted in a missing right ear, lack of a right ear canal, an inability to hear on that side, and depression.  (R. at 46).  The Social Security Administration denied his application initially on December 3, 1998, (R. at 28-35), and upon reconsideration on February 26, 1999.  (R. at 38-39).  At his request, a hearing was held before Administrative Law Judge ("ALJ") Sheldon P. Zisook on August 7, 1999. (R. at 275-93).  The ALJ issued a written decision on March 23, 2000, granting McGhee's claim and finding that he was disabled as of May 6, 1998, due to depression.  (R. at 136-43).

On June 19, 2003, the Social Security Administration provided McGhee with a Notice of Disability Cessation, in which it stated that a review of his case revealed that his health had improved, he was now able to return to work, and that his benefits would cease on August 31, 2003.  (R. at 145-46).  McGhee subsequently filed a request for reconsideration of his disability cessation, and a hearing before Disability Hearing Officer Sharon Summers was held on January 8, 2004.  (R. at 147, 149, 205-15).  Summers issued a decision on April 6, 2004, finding that McGhee was no longer

disabled. (R. at 151-57). At McGhee's request, a hearing was held before ALJ George William Jenkins, III, on December 6, 2004. (R. at 294-304). ALJ Jenkins issued a written decision on August 19, 2005, denying McGhee's claim and finding that he was no longer disabled or entitled to benefits. (R. at 10-18). After the Appeals Council denied his request for review on September 22, 2005, (R. at 5-7), McGhee, *pro se*, filed the instant appeal in the Western District of Tennessee on November 10, 2005. The case was subsequently remanded to the Commissioner pursuant to sentence six of 42 U.S.C. § 405(g)[2] because part of the record could not be located. (D.E. 10). On March 1, 2007, the Commissioner filed his answer.

## A. Prior Medical History

McGhee was born on November 9, 1973, and claims to have been disabled since May 6, 1998, due to deafness in his right ear and depression. (R. at 41). McGhee graduated from high school with honors, and at the time of his hearing before ALJ Jenkins, was a senior studying criminology at the University of Memphis. (R. at 298). He has lived with his mother in her home his entire life. (R. at 101, 229).

---

[2]Sentence six of 42 U.S.C. § 405(g) states in relevant part that "[t]he court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security . . . ."

The medical records from McGhee's initial claim for disability include a hearing evaluation conducted by Dr. Ben Cox at Memphis Hearing Aid and Audiological Services on November 18, 1998. (R. at 86-90). Dr. Cox diagnosed McGhee with congenital atresia on the right side. (R. at 86). McGhee had undergone reconstructive surgery to form a resemblance of an outer ear, although he did not have an external auditory canal. (Id.). Audiometric results indicated hearing sensitivity within normal limits for the left ear and moderate to severe hearing loss for the right ear. (Id.). Additionally, McGhee's speech reception thresholds were in agreement with pure tone results, and his speech discrimination was excellent bilaterally. (Id.). An otoscopic examination for the left ear revealed an unoccluded ear canal, but aided results for the right ear could not be obtained due to the absence of an auditory canal. (Id.).

Dr. Paul J. Katz conducted a Disability Examination of McGhee on November 19, 1998. (R. at 91). He found that McGhee was unable to hear on his right side and had undergone several plastic surgeries including skin and cartilage grafts as a child to create an external ear. (Id.). Additionally, McGhee denied experiencing pain, and he reported a history of asthma since childhood. (Id.). The physical examination revealed that McGhee was 5'11'', he weighed 145 pounds, and his vision was 20/25 uncorrected in both eyes. (R. at 92). Dr. Katz found that McGhee was a well-

developed, well-nourished black male in no acute distress, and he was alert, oriented, and cooperative. (_Id._). McGhee did not have a right ear canal, but Dr. Katz found his hearing to be grossly normal during the examination. (_Id._). McGhee's chest was clear, his heart was regular, and his abdomen was soft with no organomegaly or mass. (_Id._). McGhee's extremities did not display clubbing, cyanosis, or edema. (_Id._). He had a full range of motion in all joints. (_Id._). McGhee's cranial nerves were grossly intact, his motor strength was 5/5, his sensation was intact with no deficit, his deep tendon reflexes were 2+ and equal bilaterally, and his straight leg raising was negative bilaterally. (_Id._). Dr. Katz did not find any specific impairment related limitations. (_Id._).

On November 25, 1998, Dr. Hamsaveni Kambam conducted a Physical Residual Functional Capacity ("RFC") Assessment for McGhee. (R. at 93-100). He found that McGhee had no exertional limitations, no postural limitations, no manipulative limitations, and no visual limitations. (R. at 94-96). Dr. Kambam found that McGhee had limited hearing in his right ear and unlimited hearing in his left ear. (R. at 97). Additionally, he found that McGhee was not limited in his ability to speak and had no environmental limitations. (_Id._).

According to McGhee's Southeast Mental Health Center ("SMHC") Intake Form, completed on March 10, 1999, McGhee reported that he

had been experiencing social/interpersonal, daily living, medical/somatic, and depression or mood disorder problems for more than five years. (R. at 116). Additionally, McGhee stated that he would hurt individuals from his former job if he ran into them but eventually promised that he would not harm them. (<u>Id.</u>). McGhee also stated that he kept to himself and spent time in his room rocking and thinking. (R. at 117). McGhee also spent time writing music, and he played basketball occasionally. (<u>Id.</u>). At the time of intake, McGhee was enrolled at the University of Memphis, but he claimed to have academic problems. (<u>Id.</u>). McGhee's medical problems included right ear deafness and stable asthma. (R. at 118). McGhee denied having any alcohol or drug problems, although he stated that he drank alcohol on the weekends and smoked marijuana. (R. at 120). He also stated that he would like to use marijuana more often, but he could not afford it. (<u>Id.</u>).

McGhee's initial Psychiatric Evaluation was completed on March 23, 1999, at SMHC. (R. at 124-26). McGhee reported that there was no place where he felt really safe. (R. at 124). He stated that he was fired from his last two jobs because of his gold teeth and his missing ear. (<u>Id.</u>). He reported that he had undergone five plastic surgeries but was disappointed in the results. (<u>Id.</u>). Military recruiters had told him he could not join the military because of his inability to hear in his right ear. (<u>Id.</u>). McGhee had not been previously hospitalized or treated for mental

problems, and he did not have a family history of mental illness. (Id.).

During the mental status examination, McGhee was alert and oriented. (R. at 125). He made good eye contact, and his appearance was clean. (Id.). McGhee's mood and affect were depressed and sad to blunted. (Id.). He denied hearing voices or seeing things. (Id.). He exhibited no looseness of thought process, and his thought content included revenge on the persons who fired him and repossessed his car. (Id.). McGhee's memory was intact and unimpaired. (Id.). His intellectual functioning was average. (Id.). His abstract reasoning included perceived cruelty and being "low down." (Id.). McGhee's insight was impaired by feelings of low self-esteem. (Id.). Additionally, his judgment was impaired, but he had no thoughts of self-destruction or destructive thoughts towards others. (R. at 126). McGhee was diagnosed with mood disorder, not otherwise specified, congenital ear deformity, and difficulty focusing. (Id.). The examiner assigned him a Global Assessment of Functioning ("GAF")[3] score of

_____

[3]GAF ratings are subjective determinations based on a scale of 1 to 100 of "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual Mental of Mental Disorders (4th ed. 2000) at 32 ("DSM-IV Manual"). Each range can be described as follows: a GAF score in the range of 1-10 indicates "persistent danger of severely hurting self or others OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death;" a GAF score in the range of 11-20 indicates "some danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication;" a GAF score

sixty-five, and he was prescribed Paxil 20 mg.  (_Id._).

The medical records also show that McGhee continued outpatient mental health treatment at SMHC until late October of 1999.  (R. at 129-35).  He received treatment for trouble sleeping, paranoid thoughts, anger, headaches, worry, weight loss, and decreased appetite.  (R. at 129, 131).  He was also seen by Dr. Manuel S. Morada for an emergency medication evaluation on October 24, 1999.  (R. at 133).  Dr. Morada noted that McGhee was not compliant in taking his medication, and McGhee complained of being depressed and

---

in the range of 21-30 indicates "considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment OR inability to function in almost all areas;" a GAF score in the range 31-40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood;" a GAF score in the range of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" a GAF score in the range of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers);" a GAF score in the range of 61-70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational or school functioning (e.g., occasional truancy or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships;" a GAF score in the range of 71-80 indicates "if symptoms are present, they are transient and an expectable reaction psychosocial stressors (e.g., difficulty concentrating after family argument; no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork));" a GAF score in the range of 81-90 indicates "absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns." _Id._ at 34.

easily agitated. (Id.). McGhee also made references to people "doing things to him and making fun of him because of his congenital right ear deformity." (Id.). McGhee's hygiene and grooming were adequate, and he was somewhat restless and argumentative. (Id.). His speech was clear and normal, and he displayed an angry mood and hostile affect. (Id.). McGhee made several comments about people mumbling and making noises. (Id.). Dr. Morada noted that McGhee displayed delusions of persecution regarding confusion with his appointments, losing his job because of his ear, and people talking about his ear. (Id.). He did not present a danger to himself or to others. (Id.). McGhee was alert and fully oriented, his memory was intact, but his concentration was poor. (Id.). His abstract reasoning, insight, and judgment were also poor. (Id.). Dr. Morada noted that overall, McGhee showed some psychotic features. (Id.).

Cheri Simpson, M.S., a Licensed Psychological Examiner, conducted McGhee's psychological examination on August 30, 1999.[4] (R. at 101-08). In addition to his malformed ear and hearing loss, McGhee complained of depression, sinus problems, chronic asthma, and nervousness. (R. at 101). McGhee's medical history revealed that he denied any significant accidents, illness, surgery, or head injury and that he did not have a history of seizures or visual

_____

[4]The Supervising Psychologist on the examination was Floyd Covey, Ph.D. (R. at 108).

impairment. (Id.). Additionally, McGhee reported that even though he was able to hear well through his left ear, "sometimes I have a lot of trouble hearing people or hearing things if my ear is turned the wrong way." (R. at 101-02). McGhee also reported that he had been undergoing treatment for depression during the past six months on an outpatient basis and that he was taking Paxil 20 mg, which sometimes helped his symptoms. (R. at 102). Further, McGhee stated that he had frequent and significant headaches that he thought were related to his depression and that he took over the counter pain relievers to treat them. (Id.).

McGhee complained of having mood problems and signs of depression that included anhedonia, social withdrawal, feelings of hopelessness, anergia, feelings of guilt and worthlessness, routine sleep disturbances in the form of initial, middle night, and terminal insomnia, and decreased appetite. (Id.). McGhee had lost thirty-five pounds in the previous twelve months. (Id.). McGhee denied hallucinations, although he said that he heard noises around the house, which Simpson opined was likely stress related. (Id.). McGhee also denied paranoia, which Simpson noted was initially believable. (Id.). In addition, Simpson noted that McGhee displayed no signs of delusional thinking during the early part of the interview. (Id.). McGhee also complained of significant problems with all phases of memory and poor concentration, and he thought that his ability to concentrate and remember had declined.

(Id.).  McGhee stated that he did "good enough" in school and did not repeat grades or attend special education.  (R. at 103).

McGhee stated that his mother did all of the cooking, cleaning, grocery shopping, and household chores.  (Id.).  McGhee said that he did not have a valid driver's license, he had never driven, and he typically got around using public transportation.  (Id.).  He also said that he could maintain his personal grooming and hygiene but that he sometimes needed to be reminded to do so.  (Id.).  McGhee was aware of what number to dial in an emergency, and he could prepare a snack or sandwich or cook light meals for himself.  (Id.).  He stated that he could only find his way around his immediate neighborhood and that he was not capable of making independent purchases or managing funds.  (Id.).  Simpson noted that McGhee appeared to be incapable of independently initiating and appropriately carrying out most activities of daily living without substantial assistance from others.  (Id.).  She also found that, based on McGhee's history of dependent living, there had not been any decline in functioning, and he did not appear to have any interest in developing independent living skills.  (R. at 104).

McGhee stated that "my Mama told me I could sleep any time of the day or night and it doesn't really matter when."  (Id.).  He claimed that his days were completely unstructured and that he spent most of his time alone in his room biting his fingernails.  (Id.).  He stated that he did not watch television, listen to

music, or read.  (Id.).  McGhee denied having any interest in current events or any hobbies or recreational activities, and he denied any remarkable difference between a good day and a bad day. (Id.).

In her mental status examination of McGhee, Simpson noted that McGhee exhibited poor grooming and hygiene and that his clothes appeared to be soiled.  (R. at 104).  He had normal gait and posture and no evidence of tics or nervous mannerisms.  (Id.).  He also showed good cooperation throughout the exam.  (Id.).  McGhee spoke in a normal tone with normal volume and rate of speech. (Id.).  He displayed no evidence of loose associations or homicidal or suicidal ideation.  (Id.).  McGhee's spontaneous thought content was tangential in reference to several subjects, and Simpson found that his report of why he was fired from his last job may have indicated some level of delusional and/or paranoid ideation. (Id.).  Simpson noted that throughout the examination, McGhee made other statements that could confirm such ideation.  (Id.).  McGhee displayed a proper level of motivation and was typically spontaneous.  (Id.).  He displayed a dysphoric affect, and his range of emotional reactions was restricted.  (R. at 105).  Simpson noted that McGhee's mood was subdued throughout the testing procedure.  (Id.).

McGhee was alert and oriented as to person and place only; he was unaware of the correct day, date, or month, but he did know the

correct year and season. (Id.). He displayed a fair grasp and understanding of the test instructions, his recall of history was adequate, but his abstraction level was poor. (Id.). McGhee appeared to have only limited levels of insight and judgment. (Id.). He could recall two digits forward and three backward, which Simpson thought suggested possible impairment of short-term auditory recall. (Id.).

McGhee's Verbal IQ score was 71, his Performance IQ score was 60, and his Full Scale IQ score was 64. (Id.). His Verbal Comprehension Index was 74, his Perception Organization Index was 64, his Working Memory Index was 69, and his Processing Speed Index was 63. (Id.). Simpson found that McGhee's Full Scale IQ score fell at the mild mentally retarded range and that persons who functioned at that level were sometimes able to work in low-level or semi-skilled labor but typically needed assistance during times of economic or emotional stress. (Id.). She also found that his score was most likely an under-representation of his true cognitive abilities. (Id.). She stated that, based on his educational background and achievement testing results, McGhee was probably functioning at an overall higher level. (Id.). She opined that he was probably functioning within the upper limits of the borderline range, and his scores may have been lower due to his affective disturbance and a bad headache that he claimed to have during the examination. (R. at 106).

McGhee's WRAT-III results showed that his reading level was high school grade equivalent, and his standard score was 90. (Id.). His arithmetic was third grade equivalent, and his standard score was 62. (Id.). Simpson found that McGhee's reading score was significantly higher than his Full Scale IQ score would predict, and his arithmetic score was commensurate with his IQ score. (Id.).

During the Bender Gestalt test, McGhee produced a protocol with a poor reproduction of each card. (Id.). Errors included distortion, angle formation, collision, and perseveration. (Id.). Simpson noted that the protocol contained numerous responses that suggested organic involvement. (Id.). During the Rorshach test, McGhee produced a ten response protocol with a rejection of no cards. (Id.). McGhee's form level was somewhat borderline, which Simpson found to suggest a possible deficiency in reality testing. (Id.). Additionally, she found that the content of his answers suggested possible psychotic-like thinking in addition to anxiety, but she detected no other psychiatric symptoms. (Id.).

Simpson diagnosed McGhee with major depressive disorder, recurrent, severe, with a possibility of psychotic features and probable borderline intellectual functioning, reaching upper limits. (Id.). She also noted that he most likely had previously functioned at an overall higher level. (Id.). She also noted that he had a birth defect that resulted in total malformation of the

right ear as well as malformation of the right side of the head. (Id.). Simpson considered McGhee to be incapable of fund management due to significant affective disturbance, and McGhee reported that he was unable to manage funds and that his mother managed his money if he had any. (Id.). In sum, Simpson stated

The claimant is a 25-year-old African-American male whose primary impairment in functioning appears to be marked, affective disturbance, which may be secondary to the social ostracizing he reports having experienced throughout much of his life. In addition, the claimant made such statements to the examiner as, "When I look all funny like this I just don't want to go out because I know I don't look right and people are always gonna let me know." The claimant reports being totally deaf in his right ear. The claimant appears to be functioning at the High Borderline Range, which, while below sub-average levels, does not appear to present substantial impairment in functioning for the claimant. In addition, it is believed he was previously functioning at an overall higher level. While the [claimant's] ability to meet his daily living needs and function effectively on a daily basis is limited, at one time the claimant reports completing high school, attending college and "doing pretty good in every class when I had the chance to without being bothered." The claimant most likely would be able to understand 1, 2, and 3 step instructions, yet would likely have difficulty remembering and performing such on a consistent and reliable basis. His ability to sustain concentration and persistence is likely to be impaired. His psychosocial interactions are significantly impaired and appear to have been throughout much of his life. He may have difficulty maintaining awareness of normal hazards in his environment as well as taking necessary precautions against such. The claimant reportedly allows his mother to provide most of his daily living needs yet he reports that he attends to his own personal grooming and hygiene. The claimant would most likely be capable of functioning more independently on a daily basis if he chose to do so. While the claimant's depression would most likely impair his ability to function effectively on a daily basis, information that the claimant provided indicates that part of the reason he is depressed is because "I just feel like I don't ever

do anything."

(R. at 107). Finally, Simpson recommended that McGhee receive Vocational Rehabilitation services to assess future occupational potential with regard to his possible cognitive, psychological, and physical limitations. (R. at 107-08).

Simpson also completed a Medical Source Statement (Mental) on August 30, 1999. (R. at 109-13). She found that in making occupational adjustments, McGhee had a fair ability to follow work rules, relate to coworkers, deal with the public, and use judgment in public, a fair to poor ability to interact with supervisors and maintain attention and concentration, and a poor ability to deal with work stresses and function independently. (R. at 109-10). She noted that part of McGhee's limitations in functioning independently was that he did not appear to have attempted to develop any independent living skills. (R. at 110). In making performance adjustments, Simpson found that McGhee had a poor to fair ability to understand, remember, and carry out complex job instructions and detailed, but not complex, job instructions. (R. at 111). Additionally, he had a good ability to understand, remember, and carry out simple job instructions. (Id.). Simpson also found that McGhee had fair abilities to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (Id.).

**B.   Current Medical History**

McGhee's medical record includes a consultative psychological evaluation completed by Dr. Robin Heise of Tennessee Disability Determination Services.  (R. at 229-33).  Dr. Heise conducted a clinical interview and mental status examination of McGhee on June 9, 2003.  (R. at 229-33).  McGhee was twenty-nine years old and living with his mother at the time of the evaluation.  (R. at 229). Dr. Heise noted that McGhee had driven himself to the office and arrived early.  (<u>Id.</u>).  She found that McGhee was adequately groomed and weighed approximately 150 pounds.  (<u>Id.</u>).  She thought that his cooperation with the evaluation was adequate and considered her findings to be an accurate estimate of his current levels of psychological adjustment.  (<u>Id.</u>).

At the time of the evaluation, he was a senior pursuing his bachelor's degree in criminology at the University of Memphis.  (R. at 230).  McGhee's last job was at Technicolor Distribution as a forklift, shipping, and receiving worker.  (<u>Id.</u>).  He had worked there for two years before he was fired.  (<u>Id.</u>).  McGhee claimed that he was fired because of his "ear and knowledge of the constitution."  (<u>Id.</u>).  Prior to that, he had worked at the airport from 1989 until 1993 picking up people by wheelchair.  (<u>Id.</u>).  He stated that he quit that job because "everybody tried to get a union started."  (<u>Id.</u>).

McGhee had been receiving $621.00 in disability per month as

well as food stamps. (Id.). He reported going to the Regional Medical Center at Memphis when he needed medical care. (Id.). McGhee stated that he had trouble saying s, ch, and sc sounds, among others. (Id.). He said that he had never been hospitalized, and he was not taking any prescription medications. (Id.). He indicated that his appetite varied, and he slept about six hours each night. (Id.). McGhee had been treated for depression at SMHC, but he stopped going because he thought that SMCH was "only there for prescriptions and if you have TennCare." (Id.).

Next, Dr. Heise summarized McGhee's activities of daily living. (R. at 230-31). McGhee woke up in the morning and went to bed at various times each day, and he did not take naps. (R. at 230). Dr. Heise opined that McGhee was capable of handling his own personal hygiene and grooming, and McGhee stated that he straightened his room, took out the trash, cleaned the bathroom, cooked, shopped for groceries, paid bills, and handled money. (R. at 230-31). McGhee had a driver's license and drove, but he did not attend church or visit with friends or neighbors. (R. at 231). McGhee did visit with his family and go on dates, but he was not involved in any community activities. (Id.). Dr. Heise noted that "[a]s a hobby or for fun he files lawsuits." (Id.). McGhee also played basketball, talked on the phone, and went places. (Id.). McGhee described a good day as "a day not spent in jail" and a bad day as "a day in jail for no probable cause." (Id.). McGhee

stated that he had more good days than bad days because he had not been in jail. (Id.).

Dr. Heise also assessed McGhee's mental status. (Id.). Dr. Heise found that McGhee was oriented to time, place, person, and purpose of the evaluation. (Id.). Additionally, his memory seemed to be adequate. (Id.). McGhee stated that he was depressed because he could not get a job. (Id.). He further stated that he could not get a job because he was fired in 1998 due to his ear, although Dr. Heise noted that McGhee could not elaborate on that statement. (Id.). She also noted that McGhee spoke loudly when he was angry. (Id.). McGhee denied having any homicidal or suicidal ideation, hallucinations, delusions, paranoid ideation, or disturbance of associations. (Id.). Dr. Heise found that McGhee's stream of conversation was adequate and his ability to get along with others appeared fair. (Id.).

Dr. Heise also found that McGhee's appearance, posture, gait, and memory were adequate. (Id.). She found that his thinking was fair to poor, his affect was a little inappropriate, and his mood was "a little paranoid." (Id.). She found no indications of psychomotor disturbances. (Id.). Further, Dr. Heise found that McGhee's eye contact was adequate, his level of spontaneity was high, his volume was moderate, and his rate of speech was typical. (Id.). McGhee could recall demographic information such as age, date of birth, and address, and he could recall three out of three

words after five minutes. (Id.). Additionally, he could recall the current and preceding presidents, but he could only recall three presidents since 1950. (Id.). McGhee's math skills were adequate, as he could calculate serial 7's and serial 3's and count backwards from twenty to one. (Id.). Dr. Heise found that McGhee's recent and remote memories were adequate, his conventional logic appeared adequate, and his attitude and behaviors were fair. (Id.). Moreover, she found that there were no indications of physical difficulties that affected the evaluation. (Id.).

Dr. Heise next assessed McGhee's age-appropriate functional capabilities. (R. at 231-32). Dr. Heise found that McGhee's cognitive and communicative functioning did not appear to be limited. (R. at 232). Likewise, McGhee's personal and behavioral functioning, concentration, persistence, and pace, and his social interactions were not limited. (Id.). Dr. Heise noted that McGhee appeared to be functioning within the average range and his ability to function independently, appropriately, and effectively on a sustained basis did not appear to be limited. (Id.).

Dr. Heise's diagnostic impression was that McGhee suffered from depressive disorder not otherwise specified, rule out paranoid personality disorder. (Id.). Additionally, she found that McGhee had an average IQ, he was deaf in his right ear, and he had moderate unemployment and financial problems. (Id.). Dr. Heise assigned McGhee a GAF score of seventy-five, noting that he

experienced transient and expected reactions to psychosocial stressors. (Id.). In summary, Dr. Heise stated

> Mr. McGhee is a 29-year-old male who appears to be rather paranoid and blames his job failures on his deafness and "driving while black" and things of that nature. He seems to definitely have a chip on his shoulder and filed suit against the police department. He has been seen in therapy in the past and was unable to continue due to lack of insurance. It is recommended that he be referred back to the psychiatric community for treatment for his disorders. It is also recommended that some assistance be given in his obtaining appropriate medical insurance. If found eligible for benefits a caretaker is recommended because of his probable paranoid personality disorder.

(R. at 232-33).

Dr. H. Frank Edwards completed a Mental RFC Assessment for McGhee on June 17, 2003. (R. at 234-36). Dr. Edwards found that McGhee was not significantly limited in his understanding and memory, including his abilities to remember locations and work-like procedures, to understand and remember very short and simple instructions, and to understand and remember detailed instructions. (R. at 234). McGhee was also not significantly limited in his sustained concentration and persistence, including his abilities to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to make simple work-related decisions, to complete a normal workday and workweek without interruptions from psychologically based symptoms,

and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 234-35). Under the category of social interaction, Dr. Edwards found that McGhee was moderately limited in his abilities to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. at 235). He found that McGhee was not significantly limited in his ability to ask simple questions or request assistance. (Id.). Under the category of adaptation, Dr. Edwards found that McGhee was not significantly limited in his abilities to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, or to travel to unfamiliar places or use public transportation. (Id.). He did, however, find that McGhee was moderately limited in his ability to set realistic goals or make plans independently of others. (Id.).

Next, Dr. Edwards assessed McGhee's functional capacity. (R. at 236). He found that McGhee could understand, remember, and carry out detailed and complex instructions. (Id.). He also found that McGhee could sustain attention, maintain attendance, and complete a workweek while dealing with detailed and complex tasks. (Id.). Additionally, Dr. Edwards found that McGhee could work with

and around others, including the general public, but that he would do better dealing with things rather than people. (Id.). Finally, Dr. Edwards found that McGhee could accept criticism from supervisors and maintain appropriate social behaviors with only occasional difficulty, and he could set realistic goals without significant emotional difficulty. (Id.).

Dr. Edwards completed a Psychiatric Review of McGhee, diagnosing him with depressive disorder not otherwise specified and paranoid personality features. (R. at 237, 240, 244). Dr. Edwards also found that McGhee was mildly limited in his activities of daily living, moderately limited in maintaining social functioning, and mildly limited in maintaining concentration, persistence, or pace. (R. at 247). Dr. Edwards found that McGhee had not experienced episodes of decompensation of extended duration. (Id.). Dr. Edwards noted that McGhee's credibility was an issue. (R. at 249).

On June 17, 2003, Dr. Edwards completed an Analysis of Medical Improvement Issues comparing McGhee's condition at the time of the comparison point decision ("CPD") with his current condition. (R. at 251-52). Dr. Edwards found that at the CPD, McGhee had been diagnosed with major depressive disorder, recurrent and severe, with psychosis, and generalized anxiety disorder. (R. at 251). At the time of Dr. Edwards' analysis, McGhee had depressive disorder not otherwise specified, rule out paranoid personality disorder.

(Id.).  Additionally, at the CPD, McGhee's verbal IQ was 71, his performance IQ was 60, and his full-scale IQ was 64.  (Id.).  At the time of analysis, McGhee's intellect was average, he was a senior at the University of Memphis, and he had graduated from high school with honors.  (Id.).  Further, at the CPD, McGhee could not deal with supervisors, coworkers, or simple instructions.  (Id.).  At the time of analysis, he was a college student dealing with professors and other students, he completed household chores, paid bills, managed finances, cooked, and shopped.  (Id.).  Finally, at the CPD, McGhee did not know how to drive, could not shop, and was dependent on others.  (Id.).  At the time of analysis, he drove and shopped independently, his hobby was filing lawsuits, he denied suicidal or homicidal ideation, he denied hallucinations or delusions, and he had no limitations.  (Id.).  Dr. Edwards concluded that significant medical improvement had occurred, and he stated that "[c]redibility is a major issue.  Appears to have malingered on formal testing at allowance as would not be able to be senior in college with earlier intellect.  May have misled ALJ.  Current complaints do not appear to have origin in mental [disorder]."  (R. at 252).

Additionally, the Tennessee Department of Human Services completed a Vocational Assessment for McGhee on June 18, 2003, and determined that McGhee had the RFC for skilled work, working with things rather than people, and not requiring binaural hearing.  (R.

at 193).  It was also determined that McGhee was capable of performing his past relevant work as a Material Handler, Security Guard, and Laborer. (R. at 193-94).

On July 16, 2003, an additional RFC Assessment was completed by a different examiner.[5] (R. at 253-56).  The examiner found that McGhee had no significant limitations in the categories of understanding and memory and sustained concentration and persistence. (R. at 253).  In the category of social interaction, McGhee was moderately limited in his abilities to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. (R. at 254).  Otherwise, McGhee was not significantly limited in that category. (Id.).  Additionally, McGhee was not found to be significantly limited in the category of adaptation. (Id.).  The examiner also noted that McGhee was able to interact with the general public with some difficulty at times, but he was still able to do so. (R. at 255).  The examiner also completed a Psychiatric Review of McGhee on July 16, 2003. (R. at 257-70).  The examiner found that McGhee suffered from depressive disorder not otherwise specified and paranoid features. (R. at 257, 260, 264). Additionally, the examiner believed that McGhee's prior IQ test scores were invalid. (R. at 161).  The examiner also found that

_____

[5]The examiner's name is illegible as written on the form. (R. at 255).

McGhee was not limited in his activities of daily living and that he had not experienced episodes of decompensation of extended duration. (R. at 267). The examiner did find, however, that McGhee was moderately limited in maintaining social functioning and mildly limited in maintaining concentration, persistence, and pace. (<u>Id.</u>).

## C. Report of Continuing Disability Interview

On March 10, 2003, a disability interview was conducted. (R. at 165-74). McGhee stated that he was receiving disability benefits for deafness in his right ear and depression. (R. at 165). He stated that there had been no change in his condition, and he had no new injuries or illnesses. (<u>Id.</u>). Additionally, he stated that he was not able to return to work, although his doctor had not told him he could not return to work. (<u>Id.</u>). McGhee stated that he had not seen a doctor in twelve months, and he had not been hospitalized or treated at a clinic for his condition although an x-ray had been taken. (R. at 166-68). Additionally, no doctor had told McGhee to limit his activities in any way. (R. at 168). McGhee stated that he was able to walk without difficulty and dress and bathe without assistance. (<u>Id.</u>). He did state, however, that he needed assistance cooking and cleaning and that he stayed in his room all day. (R. at 169). For recreation, he stated that he watched the news, but he did not visit with friends or family or attend church. (<u>Id.</u>). He also stated that he could

drive without difficulty, and he had not attended any vocational training and he was not attending school.  (Id.).  McGhee stated that he had not worked since he had become disabled and was not receiving help from a vocational rehabilitation agency or program. (R. at 169-70).  The interviewer noted that McGhee did not appear to have difficulty breathing, seeing, speaking, hearing, sitting, walking, standing, using his hands and arms, writing, reading, comprehending, responding, or relating to people.  (R. at 173).[6]

## D.  Activities of Daily Living Questionnaire

McGhee completed an undated[7] Activities of Daily Living questionnaire as part of the review of his eligibility for benefits.  (R. at 185-92).  The answers he provided were sarcastic and threatening in nature.  For example, McGhee stated that he does not use drugs because he does not "own any planes or boats to smuggle those economy boosters," his activities outside the home consist of visiting his nearest social security office, he does not cook because he is not a woman, and he needs help getting places because he needs "V.I.P. treatment" and prefers a limousine.  (R. at 187-88).

## E.  Disability Hearing

On January 8, 2004, a hearing was held before Disability

_____

[6]A second interview took place on June 24, 2003.  However, several pages of the interview appear to be missing from the record.  (R. at 201-02).

[7]On the date line, McGhee wrote "today of course."  (R. at 192).

Hearing Officer Sharon Summers to determine whether McGhee's disability had improved and whether he was able to work. (R. at 150-51). Summers found that at the CPD, McGhee had major depressive disorder, recurrent, severe, with a possibility of psychotic features and generalized anxiety disorder. (R. at 155). McGhee also had probable borderline intellectual functioning, reaching upper limits, and a birth defect resulting in malformation of the right side of the head including the right ear. (Id.). As of the date of the hearing, McGhee had depressive disorder, average intelligence, adequate memory, and his thinking was fair to poor. (Id.). Summers also found that McGhee's conventional logic appeared to be adequate, his attitude and behaviors were fair, and his cognitive and communicative functioning and his personal and behavioral functioning did not appear to be limited. (Id.). Additionally, he appeared to be unlimited in his ability to function independently, appropriately, effectively, and on a sustained basis. (Id.). McGhee reported that he was teased about his ear and continued to be depressed. (Id.). Summers noted that McGhee's "[c]redibility is a major issue in view of the entire record." (Id.). She also noted that he was poorly groomed during the hearing, he adequately cooperated, and he had satisfactory recall and good eye contact. (Id.). Summers stated that

> An analysis of the total evidence establishes the
> claimant has problems with depression and has an average
> intelligence. There is no evidence in the file that he
> is currently involved with mental health treatment or

-28-

medication for depression.  It is noted he is a senior at the University of Memphis majoring in criminal justice. He was an honor graduate in high school.  He has racial anger.  He is capable of dealing with professors and other students.  He performs household chores, pays bills, manages finances, cooks and shops. He drives and shops independently.  His hobbies consist of filing lawsuits. He denies suicidal and homicidal thoughts.  He denies hallucinations and/or delusions.  He functions in the university setting with satisfactory hearing abilities.  It is concluded the claimant has shown significant medical improvement overall.

(R. at 155-56).

In her decision, Summers found that McGhee was not engaging in substantial gainful activity, his impairments did not meet or equal a criteria of the Listings, and there had been medical improvement of his impairments since the CPD that related to his ability to do work. (R. at 158-59).  Specifically, she found that his ability to perform activities of daily living had improved significantly and he had the capacity to perform work activity.  (R. at 159). Summers also found that McGhee's depression was a severe impairment that impacted his activities of daily living but that he had the RFC to perform skilled and unskilled work at any exertional level. (R. at 156, 160).  Additionally, Summers found that McGhee was able to interact with the general public. (Id.).  She also found that his impairments did not prevent him from doing past relevant work. (R. at 161).

## F.   Disability Determinations

Michael Taylor, a disability examiner, and Dr. Lansdon B. Robbins, II, completed McGhee's Cessation of Disability

Determination on June 18, 2003. (R. at 227-28). They found that McGhee had a primary diagnosis of affective/mood disorders and a secondary diagnosis of deafness. (R. at 227). They also found that although McGhee had decreased hearing, he had the ability to hear and understand conversations satisfactorily. (R. at 228). Additionally, they determined that McGhee was able to communicate with others, act in his own interest, and perform most ordinary activities. (Id.). They determined that because his health had improved, he was no longer disabled. (Id.).

## G.  Administrative Hearing

McGhee appeared *pro se* at a hearing before ALJ Jenkins in Memphis, Tennessee, on December 6, 2004. (R. at 295-304). McGhee testified that he was thirty-one years old and lived with his mother in her house. (R. at 297-98). He stated that during the day, he occupied his time by watching the news, reading the newspaper, and applying for jobs. (R. at 298). McGhee also stated that he was a senior at the University of Memphis studying Criminal Justice, although he had not been in school for about eighteen months because he was in the process of transferring to a "black college." (R. at 298-99, 300). He stated that he was considered a full-time student, and he had approximately thirty-three hours remaining to finish his degree. (R. at 298). McGhee testified that he was paying for school through Vocational Rehabilitation and student loans. (Id.). He stated that he had to meet with

Vocational Rehabilitation twice a year and that he was not going to any classes or training through its programs. (R. at 302-03). McGhee testified that he had tried to use his ticket to work voucher, but that his counselors kept being switched and he could not keep in touch with them. (R. at 303).

McGhee testified that he last worked for Technicolor, a distribution company, in 1998. (R. at 299). He stated that he was fired from that job and that he had filed a lawsuit against Technicolor that was on appeal at the time of the hearing. (Id.). McGhee stated that his mother was receiving Social Security disability benefits, and he was not often home alone. (R. at 299-300).

McGhee stated that he believes he should continue to receive Social Security benefits because "there's no medicine or technological aide that can help me hear from my right ear. I don't have an ear canal anyway so – and it's – my disability [benefit payments] keeps me from being harassed on the job site and it keeps me from getting employed as well, so." (R. at 300). He testified that in class he preferred to sit in the front so that he could hear. (Id.). He also stated that he had applied for jobs at various places including J.C. Penney and Eastwood Medical Center. (Id.).

McGhee testified that his hobbies included writing music and poems, reading, doing math, and playing the drums. (R. at 301).

He stated that he did not have trouble sleeping. (Id.). When asked whether he had pain in his right ear, McGhee said

> Some, you know, I don't feel pain as in pain, pain that hurts but sometimes, you know, it's like if the train is coming in the neighborhood off the track, I get a little tingling sensation like it's ringing on this side because of the loudness but other than that, no pain.

(R. at 302). McGhee also stated that he helped his mother around the house by washing dishes, feeding the dog, taking out the trash, and that he did "everything to help out." (Id.). Finally, McGhee testified that he was fired from two jobs because his supervisors realized that he had a hearing disability, and he stated "I can hear but it's the harassment that I can't deal with." (R. at 303).

## H.  The ALJ's Decision

The ALJ issued his decision denying McGhee's claims on August 19, 2005. (R. at 10-18). Applying the eight-step sequential analysis for continuing disability,[8] the ALJ found at step one that

---

[8]Continued entitlement to Social Security disability benefits is determined by a sequential analysis set forth in the Social Security Regulations that may involve up to eight steps. 20 C.F.R. §§ 404.1594, 416.994. First, the claimant must not be engaged in substantial gainful activity. 20 C.F.R. § 404.1594(f). Second, the claimant must suffer from a severe impairment. Id. Third, the ALJ must determine whether there has been medical improvement. 20 C.F.R. §§ 404.1594(f)(3), (b)(1). Fourth, the ALJ must determine whether the medical improvement is related to the claimant's ability to do work. 20 C.F.R. §§ 404.1594(f)(4), (b)(1)-(4). At the fifth step, the ALJ must determine whether any exceptions apply. 20 C.F.R. §§ 404.1594(f)(5), (d), (e). At step six, the ALJ must determine whether all of the claimant's current impairments are severe. 20 C.F.R. § 404.1594(f)(6). At the seventh step, if the claimant's impairment is severe, the ALJ will assess the claimant's current ability to perform substantial gainful activity. 20 C.F.R. § 404.1594(f)(7). Finally, at step

McGhee was not engaged in substantial gainful activity. (R. at 14). At step two, the ALJ found that McGhee's impairments were severe but did not meet or equal the severity of any impairments listed in Appendix 1, Subpart P, Regulations No. 4 (the "Listings"). (Id.). At steps three and four, the ALJ had to determine whether there had been medical improvement related to McGhee's ability to work. (Id.).

The ALJ found that medical improvement had occurred. (R. at 15). In making that determination, he compared the severity of McGhee's impairments as of the date of the most recent favorable decision on his claim, March 23, 2000, with the current severity of his impairments. (R. at 14). The ALJ noted that the only current medical evidence in the record was Dr. Heise's consultative psychological evaluation from June 9, 2003, and he therefore relied primarily on her findings. (R. at 14-15). The ALJ also considered the state agency consultative psychological examinations. (R. at 16). The ALJ found that as of the CPD,

> the claimant was found to have a depressive disorder which prevented him from meeting the mental demands of unskilled work on a sustained basis. A consultative psychological evaluation on August 30, 1999 resulted in diagnoses of major depressive disorder, recurrent, severe, with a possibility of psychotic features; and generalized anxiety disorder. The claimant reported that he lived with his mother and that she performed all the

eight, if the claimant is not able to perform past relevant work, the ALJ must determine whether the claimant can perform other work which exists in significant numbers in the national economy. 20 C.F.R. § 404.1595(f)(8).

cooking, cleaning, grocery shopping, and household
chores. The claimant also reported that he had never
driven and did not have a driver's license. The claimant
displayed poor grooming and hygiene. The psychological
examiner was of the opinion that the claimant had a poor
ability to deal with work stresses, a fair to poor
ability to interact appropriately with supervisors, and
only a fair ability to relate to co-workers. The
Administrative Law Judge who issued the decision on March
23, 2000 found the claimant was precluded from performing
all basic mental work-related activities.

(R. at 14) (internal citations omitted). The ALJ noted that in
June of 2003, it was found that there had been medical improvement
and that McGhee was capable of work at all exertional levels that
required only infrequent interaction with the public. (<u>Id.</u>).
Additionally, the ALJ found that McGhee was currently able to
perform all activities of daily living, and he was receiving no
mental health treatment. (<u>Id.</u>).

In further comparing McGhee's condition at the CPD with his
current condition, the ALJ stated that at the time of the most
recent favorable decision, McGhee was diagnosed with major
depressive disorder, "which precluded him from meeting the basic
mental demands of unskilled work on a sustained basis." (R. at
14). The ALJ noted that the current evidence showed that McGhee
was receiving no mental health treatment, and although he was
experiencing mild depressive symptoms and paranoid traits, the
consultative psychological examiner found no real limitations to
successful work-like activities. (<u>Id.</u>). The ALJ also noted that
at the CPD, intelligence testing "resulted in an opinion that the

claimant's intellectual functioning was within the upper limits of the borderline range," but the current evaluation showed average intellectual functioning. (Id.). The ALJ further stated that he was "in agreement with the state agency psychological consultant that the prior testing was obviously invalid," and he agreed that McGhee's credibility was a major issue and that McGhee appeared to have malingered on the prior intelligence tests. (Id.). Thus, the ALJ concluded that there had been medical improvement. (Id.).

The ALJ next determined that the medical improvement was related to McGhee's ability to work. (R. at 15). He noted that McGhee had depressive disorder not otherwise specified, rule out paranoid personality disorder, which caused "more than a minimal effect on his ability to perform work activity." (Id.). The ALJ next observed that a determination of whether McGhee could perform his past relevant work or other work required an assessment of his RFC. (Id.). The ALJ concluded that McGhee had the RFC to perform work at any exertional level that required infrequent interaction with the general public. (R. at 16). In making that determination, the ALJ considered the objective medical evidence as well as McGhee's subjective complaints and symptoms as set forth in 20 C.F.R § 404.1529 and Social Security Ruling 96-7p. (R. at 15). The ALJ noted that McGhee had testified that he had attended college through the aid of Vocational Rehabilitation and student loans. (Id.). Additionally, McGhee had testified that he had

tried to find a job, he wrote music and poetry, played the drums, and read. (Id.). McGhee had also stated that he performed household chores. (Id.). The ALJ concluded that McGhee's allegations of total disability were not persuasive because the current medical evidence included an essentially normal mental status evaluation, McGhee was no longer receiving mental health treatment, and his activities of daily living were not significantly limited. (R. at 16). The ALJ stated that his RFC assessment was consistent with the state agency psychological consultants. (Id.). Additionally, the ALJ noted that he did not find any exertional limitations because there were no signs, symptoms, or laboratory findings to support such a conclusion under 20 C.F.R. § 404.1508.

The ALJ then assessed any functional limitations attributable to McGhee's impairments. (R. at 16). The ALJ considered Part B of Listings 12.04 and 12.08. (R. at 16); 20 C.F.R. § 404.1508. He found that McGhee was not restricted in his activities of daily living, he had mild difficulties in maintaining social functioning, he was independent and competent in performing adaptive activities, he had moderate difficulties in maintaining social functioning, he displayed some anger and perceived injustice that may interfere with some interaction, but he could interact appropriately when he chose to. (R. at 16). Additionally, the ALJ noted that the state agency psychological consultants believed that McGhee had no more

than mild difficulties in his ability to maintain concentration, persistence, or pace, and the consultative psychological examiner found no significant limitations in McGhee's concentration, persistence, or pace. (Id.). Finally, the ALJ found that there was no evidence of episodes of decompensation, and he noted that the evidence did not establish the presence of the "C" criteria of the Listings. (Id.).

The ALJ then proceeded to the next step in the sequential evaluation, determining whether McGhee could perform his past relevant work. (R. at 16). McGhee's past relevant work included jobs as a material handler and a machine operator. (Id.). The ALJ determined that, based on the definition in the Dictionary of Occupational Titles, the exertional and nonexertional requirements of those jobs as generally performed in the economy were consistent with McGhee's RFC. (R. at 16); see Dictionary of Occupational Titles 929.687-030, 619.685-062 (1991), available at 1991 WL 688174. Therefore, the ALJ concluded that McGhee retained the capacity to perform his past relevant work, that as of June of 2003, McGhee was no longer disabled within the meaning of the Social Security Act, and that his entitlement to disability benefits ended on August 31, 2003. (R. at 16).

## II.  PROPOSED CONCLUSIONS OF LAW

In his pro se appeal, McGhee appears to argue that the ALJ's decision is not supported by substantial evidence.

## A.    Standard of Review

Judicial review of the Commissioner's decision is limited to whether there is substantial evidence to support the decision, 42 U.S.C. § 405(g); Drummond v. Comm'r of Soc. Sec., 126 F.3d 837, 840 (6th Cir. 1997), and whether the correct legal standards were applied. Landsaw v. Sec'y of Health & Human Servs., 803 F.2d 211, 213 (6th Cir. 1986).  When the record contains substantial evidence to support the Commissioner's decision, the decision must be affirmed. Stanley v. Sec'y of Health & Human Servs., 39 F.3d 115, 117 (6th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401 (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

In determining whether substantial evidence exists, the reviewing court must examine the evidence in the record taken as a whole and must take into account whatever in the record fairly detracts from its weight. Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990).  When substantial evidence supports the Commissioner's determination, it is conclusive, even if substantial evidence also supports the opposite conclusion. Felisky v. Bowen, 35 F.3d 1027, 1035 (6th Cir. 1994).  Similarly, the court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. Cutlip v. Sec'y of Health & Human

Servs., 25 F.3d 284, 286 (6th Cir. 1994).

Benefits may only be discontinued if (1) there is substantial evidence to support a finding of medical improvement related to an individual's ability to work, and (2) the individual is now able to engage in substantial gainful activity. 42 U.S.C. § 423(f); 20 C.F.R. § 404.1594(a); Cogswell v. Barnhart, No. 04-171-P-S, 2005 WL 767171, at *1 (D. Me. March 14, 2005). Medical improvement is any decrease in the medical severity of an impairment which was present at the time of the most recent favorable medical decision that a claimant was disabled or continued to be disabled. 20 C.F.R. § 404.1594(b)(1). To find that there has been medical improvement, "the Commissioner must compare the prior and current medical evidence to determine whether there have been any such changes in the signs, symptoms and laboratory findings associated with the claimant's impairment." Rice v. Chater, 86 F.3d 1, 2 (1st Cir. 1996); 20 C.F.R. § 404.1594(b)(1). Changed symptoms, signs, and laboratory findings "are the only relevant indicia of medical improvement under the regulations." Rice, 86 F.3d at 2. Medical improvement relates to an individual's ability to work "if there has been a decrease in the severity . . . of the impairment(s) present at the time of the most recent favorable medical decision and an increase in [the] functional capacity to do basic work activities . . . ." 20 C.F.R. § 404.1594(b)(3); see Kennedy v. Astrue, No. 06-6582, 2007 WL 2669153, at *3 (6th Cir. Sept. 7,

2007).

The second part of the evaluation, whether the individual is now able to engage in substantial gainful activity, involves many of the same standards for initial disability determinations. 20 C.F.R. § 404.1594(b)(5), (f)(7); see Kennedy, 2007 WL 2669153, at *4. In a determination of cessation of benefits, however, the burden of proof lies with the Commissioner, not the claimant. Kennedy, 2007 WL 2669153, at *4.

## B. Substantial Evidence Supports the ALJ's Decision

The court submits that the ALJ's decision is supported by substantial evidence and that the ALJ applied the correct legal standards. In reaching his decision, the ALJ carefully compared the medical evidence at the time of the most recent favorable decision (March 23, 2000) with the current medical evidence. As of March 23, 2000, McGhee had been diagnosed with major depressive disorder, recurrent, severe, with a possibility of psychotic features, and generalized anxiety disorder that prevented him from meeting the mental demands of unskilled work on a sustained basis. At that time, his mother did all the cooking, cleaning, shopping, and other chores, and McGhee did not drive or have a driver's license. McGhee displayed poor grooming and hygiene, and he had a poor ability to deal with work stresses, a fair to poor ability to interact appropriately with supervisors, and a fair ability to relate to coworkers.

Dr. Heise's consultative psychological evaluation supports the ALJ's decision that medical improvement had occurred. McGhee told Dr. Heise that he performed many household chores, including straightening his room, taking out the trash, cleaning the bathroom, light cooking, shopping, paying bills, and handling money. McGhee had a driver's license and drove a car. He visited with his family, played basketball, talked on the phone, and went on dates. He was fully oriented and had an adequate memory. McGhee still experienced some depression because he could not get a job, but he denied any homicidal or suicidal ideation, hallucinations, delusions, paranoid ideation, or any other thought disorder. Dr. Heise found McGhee's attitude and behaviors to be fair. Additionally, McGhee's attention and concentration were adequate, and Dr. Heise found that his cognitive and communicative functioning were not limited, nor were his personal and behavioral functioning or his concentration, persistence, and pace. Dr. Heise also found that McGhee's ability to get along with others was fair and that his ability to interact socially was not limited. Finally, Dr. Heise found that McGhee's ability to function independently, appropriately, and effectively on a sustained basis was not limited. Dr. Heise diagnosed McGhee with depressive disorder not otherwise specified, and assigned him a GAF score of seventy-five.

In addition, Dr. Edwards' Analysis of Medical Improvement

Issues comparing McGhee's condition at the time of the CPD with his current condition further supports the ALJ's decision. For reasons set forth in his analysis, Dr. Edwards concluded that significant medical improvement had occurred, and he stated that "[c]redibility is a major issue. Appears to have malingered on formal testing at allowance as would not be able to be senior in college with earlier intellect. May have misled ALJ. Current complaints do not appear to have origin in mental [disorder]."

The medical evidence also supports the ALJ's finding that McGhee's testimony regarding his limitations and symptoms was not fully credible. An "ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997) (an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witnesses' demeanor and credibility). Here, the ALJ's credibility determination was based on, among other things, evidence that McGhee was a senior in college, was not experiencing academic problems, performed many household chores and could drive,

engaged in a number of hobbies such as reading, writing, and playing music, and had an essentially normal mental status examination.

Other evidence that supports the ALJ's finding of medical improvement include McGhee's improvement in intellectual functioning, increased activities of daily living and recreational activities, improved ability to engage in successful work-like activities and interact with others, increased GAF score from sixty-five to seventy-five, and his lack of mental health treatment since 1999.[9] See McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990); Hale v. Sec'y of Health & Human Servs., 816 F.2d 1078, 1082 (6th Cir. 1987); Banks v. Apfel, 144 F. Supp. 2d 752, 756 (E.D. Ky. 2001).

The court also submits that the ALJ's determination that the medical improvement relates to McGhee's ability to work is supported by substantial evidence. Specifically, the ALJ's determination that there had been an increase in McGhee's functional capacity to perform basic work activities, see 20 C.F.R. § 404.1594, is supported by the state agency psychological consultants' evaluations. They found that McGhee could understand,

_____

[9]Although McGhee testified at the hearing before the ALJ that he stopped going to SMCH because he thought it was "only there for prescriptions and if you have TennCare," there is no evidence in the record that suggests that McGhee ever attempted to seek any treatment or counseling since 1999, or that he was ever denied treatment based on his inability to pay.

remember, carry out, and sustain attention and concentration for detailed and complex instructions; he could keep to a schedule, maintain attendance, and complete a work week while dealing with detailed and complex tasks; he could work with and around others, including the general public, although he would do better working with things rather than people; and he could accept criticism from supervisors and maintain appropriate social behaviors with only occasional difficulty. Moreover, McGhee had no exertional, postural, manipulative, visual or environmental limitations, as evidenced by the findings of Drs. Katz and Kambam.

The court further submits that substantial evidence supports the ALJ's determination that McGhee could perform his past relevant work as a material handler and a machine operator, as the requirements of those jobs are consistent with McGhee's RFC to perform work at all exertional levels requiring infrequent interaction with the general public.

As a final matter, McGhee has filed two motions styled Motion for Leave to File Amended Pleading (D.E. 20) and Second Request for Leave to File Amended Pleading (D.E. 22), which the court construes as motions to submit new evidence.[10] In addition, attached as

---

[10]The documents that McGhee asks the court to consider are attached as exhibits to his motions to amend. With respect to his motion at D.E. 20, it appears that the exhibits were served on the Commissioner but not filed with the court, as no exhibits are attached to the motion as filed on the docket. According to the Commissioner's response in opposition to D.E. 20, the exhibits include a charge of discrimination filed by McGhee with the

exhibits to McGhee's brief filed April 5, 2007, are medical records from the Memphis Hearing Aid and Audiological Services from 1998, his standardized test records from high school, and his Response in Opposition to Defendant's Motion for Summary Judgment filed December 22, 1999 in <u>McGhee v. Technicolor Distribution Co.</u>, 98-2990-G/V (W.D. Tenn.).

It is well-settled that this court may only consider new evidence as grounds for remand if it is "new and material, and there was good cause for not presenting it in the prior proceeding." <u>Cline v. Comm'r of Social Security</u>, 96 F.3d 146, 148 (6th Cir. 1996). In order to be material, new evidence must be non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the Commissioner's determination. <u>Sizemore v. Sec'y of Health and Human Servs.</u>, 865 F.2d 709, 711 (6th Cir. 1998); <u>Oliver v. Sec'y of Health and Human Servs.</u>, 804 F.2d 964, 966 (6th Cir. 1986). With respect to documents that were available at the time of McGhee's

_____

Tennessee Human Rights Commission ("THRC") on October 23, 2007, which the court submits is certainly not material evidence, and two pages of medical records and the March 23, 2000 ALJ decision, which are already contained in the administrative record at pages 107, 133, and 139-44, respectively. Attached to McGhee's second motion at D.E. 22 are an undated patient counseling printout from Southeast Pharmacy Services for Mirtazapine 30 mg and a SMHC Crisis Plan dated December 3, 2007. These documents, at most, merely support the ALJ's finding that McGhee is still experiencing some level of depression.

hearing before ALJ Jenkins, McGhee has not shown good cause for failing to timely present the documents at the hearing. Moreover, McGhee has not shown that any of these documents are material. However, even if the court were to consider these documents in its analysis, the court nevertheless submits that substantial evidence supports the ALJ's decision.

### III. RECOMMENDATION

For the reasons above, the court submits that the ALJ's findings are supported by substantial evidence and recommends that McGhee's appeal be denied and the Commissioner's decision be affirmed. The court further recommends that McGhee's Motion for Leave to File Amended Pleading and Second Request for Leave to File Amended Pleading be denied.[11]

---

[11]McGhee also argues that he is entitled to a jury trial. The court submits that this argument is without merit. Judicial review of decisions of the Commissioner is governed by 42 U.S.C. § 405(g), which does not include the right to a jury trial. See Willis v. Comm'r of Soc. Sec., No. 04-10241, 2006 WL 453472, at *3 (E.D. Mich. Feb. 22, 2006); see also Ginter v. Sec'y of the Dep't of Health, Educ. and Welfare, 621 F.2d 313, 313-14 (8th Cir. 1980) ("The district court has a limited role under . . . 42 U.S.C. § 405(g). That role is limited to reviewing the administrative record to determine whether there is substantial evidence to support the findings of the Secretary. It cannot grant a trial *de novo* before either the court or a jury."); Ross v. Chater, 930 F.Supp. 1452, 1454 (D. Kan. 1996) (holding that there is no right to a jury trial in an action for review of a decision denying benefits under the Social Security Act).

Respectfully submitted,

s/ Tu M. Pham
_____
TU M. PHAM

United States Magistrate Judge


February 7, 2008
_____
Date


**NOTICE**

    **ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN TEN (10) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN TEN (10) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**